## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KYLE CLARKE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA BOOKS INC. D/B/A COLUMBIA BOOKS & INFORMATION SERVICES,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kyle Clarke ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Defendant Columbia Books Inc. d/b/a Columbia Books & Information Services ("CBI") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *U.S. Congress Handbook* book purchase to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, political

organizations, and non-profit companies. As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period[1], CBI violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.      Documented evidence confirms these facts. For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "Columbia Books & Information Services Masterfile Email List Mailing List", which contains the Private Reading Information of 1,973,357 of CBI's U.S. customers' at a base price of "$300.00/M [per thousand]," (i.e., 30 cents apiece), as

---

[1]      The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]      In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

shown in the screenshot below:



## Columbia Books & Information Services Masterfile Email List Mailing List

Columbia Books & Information Services (CBIS) is a leading provider of compliance information, training and in-depth data across a range of subject areas including associations, nonprofits, grants, government relations, federal contracting, FDA, energy, paint contracting and meeting planning.

<span style="color:red">**Get Count**</span>  <span style="color:red">**Get Pricing**</span>  <span style="color:red">**Get More Information**</span>

| SEGMENTS | COUNTS THROUGH 12/31/2021 | | POPULARITY: | ▬▬▬▬ 99 |
|---|---|---|---|---|
| 1,973,357 TOTAL UNIVERSE / BASE RATE | $300.00/M | | MARKET: | BUSINESS |
| 1,973,357 EMAIL ADDRESSES | $300.00/M | | CHANNELS: | |
| 2,966,672 POSTAL ADDRESSES AVAILABLE | $150.00/M | | SOURCE: | PUBLICATIONS |
| **DESCRIPTION** | | | PRIVACY: | UNKNOWN |
| *Columbia Books & Information Services (CBIS)* | | | DMA? | YES - MEMBER |
| | | | STATUS: | STANDARD PROVIDER |
| *www.columbiabooks.com* | | | GEO: | USA |

**CBIS**
Columbia Books & Information Services

| SELECTS | |
|---|---|
| BUSINESS/INDUSTRY TYPE | $15.00/M |
| EMPLOYEE SIZE | $15.00/M |
| GEOGRAPHY | $10.00/M |
| JOB FUNCTION/TITLE | $15.00/M |
| SALES VOLUME | $15.00/M |

Columbia Books & Information Services (CBIS) is a leading provider of compliance information, training and in-depth data across a range of subject areas including associations, nonprofits, grants, government relations, federal contracting, FDA, energy, paint contracting and meeting planning.

For more than 40 years CBIS has provided users with compliance resources and training, print directories, online databases, and customized data delivery. Our dedicated staff has extensive experience capturing and delivering relevant, accurate and highly useful information to our clients.

Columbia Books & Information Services (CBIS) has made their email database available exclusively through *Data Axle Targeting Solutions*. Best of all, using the list is easy. All you need to do is email us the message you want to send. We will then select and transmit your message to the **Columbia Books & Information Services (CBIS)** for you from our email servers.

| ADDRESSING | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| A/B SPLIT | NO CHARGE |
| CUSTOMER FILE DEPLOYMENT | $25.00/M |
| CUSTOMER FILE DEPLOYMENT (MIN.) | $200.00/F |
| EACH ADDITIONAL SPLIT | $100.00/F |
| ENHANCED DELIVERABILITY REPORT | $100.00/F |
| GOOD CUSTOMER PROFILE | $500.00/F |
| IMAGE HOSTING | $100.00/F |
| MATCH & DEPLOY | $500.00/F |
| MOBILE DEVICE VIEW | $100.00/F |
| PERSONALIZATION | NO CHARGE |
| PIN CODING | $350.00/F |
| SUPPRESSION | $150.00/F |
| TRANSMISSION HTML | $115.00/M |
| TRANSMISSION TEXT | $95.00/M |
| WEB FORM CREATION (PLEASE INQUIRE) | |

| RELATED LISTS |
|---|
| HR.COM EMAIL MASTERFILE |
| COLUMBIA BOOKS & INFORMATION SERVICES MASTERFILE MAILING |

*See* **Exhibit A** hereto.

3.    By renting, exchanging, or otherwise disclosing the Private Reading Information of its Michigan-based customers during the relevant pre-July 31, 2016 time period, CBI violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or

> lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

4.    Accordingly, Plaintiff brings this Class Action Complaint against CBI for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

## NATURE OF THE CASE

5.    To supplement its revenues, CBI rents, exchanges, or otherwise discloses its customers' information—including their full names, types of publications purchased, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as job title and industry—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

6.    By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, CBI is able to disclose the information time and time again to countless third parties.

7.    CBI's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows

4

for the targeting of particularly vulnerable members of society.

8.      While CBI profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because CBI does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## PARTIES

9.      Plaintiff Kyle Clarke is a natural person and citizen of the State of Michigan and resides in Traverse City, Michigan. Plaintiff purchased the book titled *U.S. Congress Handbook* prior to July 31, 2016. *U.S. Congress Handbook* book is published by CBI. While residing in, a citizen of, and present in Michigan, Plaintiff purchased his book, the *U.S. Congress Handbook* directly from CBI. Prior to and at the time Plaintiff purchased *U.S. Congress Handbook*, CBI did not notify Plaintiff that it discloses the Private Reading Information of its customers, and Plaintiff has never authorized CBI to do so. Furthermore, Plaintiff was never provided any written notice that CBI rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. Since purchasing *U.S. Congress Handbook*, and during the relevant pre-July 31, 2016 time period, CBI disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then

supplement that information with data from their own files. Moreover, during that same period, CBI rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact CBI customers, without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

10. Defendant Columbia Books Inc. d/b/a Columbia Books & Information Services is a Washington, D.C. corporation with its headquarters and principal place of business in Arlington, Virginia. CBI does business throughout Michigan and the entire United States. CBI is the publisher of numerous informational books and other publications, including *U.S. Congress Handbook*.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

12. The Court has personal jurisdiction over CBI because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *U.S. Congress Handbook* book in Michigan, CBI's direction of such *U.S. Congress Handbook* book into Michigan, and CBI's failure to

obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over CBI in Michigan because CBI conducts substantial business within Michigan, such that CBI has significant, continuous, and pervasive contacts with the State of Michigan.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, CBI does substantial business in this judicial District, CBI is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

14.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

15.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

16.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

17.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

18.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act,

18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

19.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

20.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

21.     Despite the fact that thousands of Michigan residents have purchased CBI's publications, CBI disregarded its legal responsibility by systematically violating the PPPA.

### The Private Information Market:
### Consumers' Private Information Has Real Value

22.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

23.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

24.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

---

[3]     **Exhibit C**, The Information Marketplace:  Merging and Exchanging Consumer   Data   (Mar.   13,   2001),   at   8:15-11:16,   *available   at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last   visited July 30, 2021).

[4]     *See* **Exhibit D**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[5]     **Exhibit E**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

25.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

26.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

27.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

28.     Recognizing the serious threat the data mining industry poses to

---

[6]     *See* **Exhibit F**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[7]     **Exhibit G**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[8]     **Exhibit H**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

29.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

30.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like CBI share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to

---

[9]     *See* **Exhibit I**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[10]     *Id.*

[11]     *See* **Exhibit J**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

31.    Information disclosures like those made by CBI are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

32.    Thus, information disclosures like CBI's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of

---

[12]    **Exhibit K**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[13]    *Id.*

[14]    **Exhibit L**, *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

33.     CBI is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

34.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases*

35.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

36.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result,

---

[15]     *See id.*

[16]     *See* **Exhibit M**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

37.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

38.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[18]

39.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent

---

content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[17]     *Id.*

[18]     *See* **Exhibit N**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

policies of protecting their data.[19]

40.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

### CBI Unlawfully Rents, Exchanges, And Discloses Its Customers' Private Reading Information

41.     CBI maintains a vast digital database comprised of its customers' Private Reading Information.   CBI discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each CBI customer, including his or her job title and industry.  (*See, e.g.*, **Exhibit A**).

42.     CBI then rents and/or exchanges its mailing lists—which include customers' Private Reading Information identifying which individuals purchased particular books, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other

---

[19]     *See* **Exhibit O**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), discussed in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[20]     *See* **Exhibit P**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

43.     CBI also discloses its customers' Private Reading Information to data cooperatives, who in turn give CBI access to their own mailing list databases.

44.     As a result of CBI's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from CBI that identify CBI's customers by their most intimate details such as their job title and industry.  CBI's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

45.     CBI does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

46.     During the relevant pre-July 31, 2016 time period, consumers purchased CBI's publications through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer made a purchase, CBI never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016

time period, CBI uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

47.     As a result, CBI disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

48.     By and through these actions, CBI has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by CBI without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

50.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in

---

[21]     **Exhibit Q**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

51.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether CBI is a "retailer or distributor" of publications (*i.e.*, books); (b) whether CBI obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading Information; and (c) whether CBI's disclosure of Plaintiff's and the Class's Private Reading Information violated the PPPA.

52.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading Information.

53.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly

and adequately protected by Plaintiff and his counsel.

54.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
**Violation of Michigan's Preservation of Personal Privacy Act**
**(PPPA § 2)**

55.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant CBI.

57. As a book publisher that sells books to consumers, CBI is engaged in the business of selling written materials at retail. *See* PPPA § 2.

58. By purchasing the *U.S. Congress Handbook* book, Plaintiff purchased written materials directly from CBI. *See* PPPA § 2.

59. Because Plaintiff purchased written materials directly from CBI, he is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

60. At various times during the pre-July 31, 2016 time period, CBI disclosed Plaintiff's Private Reading Information, which identified him as a *U.S. Congress Handbook* customer, in at least three ways.

61. First, CBI disclosed mailing lists containing Plaintiff's Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to CBI.

62. Second, CBI disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave CBI access to their own mailing list databases.

63. Third, CBI rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary

contributions, volunteer work, and votes.

64. Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and CBI was able to increase its profits gained from the mailing list rentals and/or exchanges.

65. By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, CBI disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from CBI. *See* PPPA § 2.

66. The information CBI disclosed indicates Plaintiff's name and address, as well as the fact that he purchased *U.S. Congress Handbook*. Accordingly, the records or information disclosed by CBI indicated Plaintiff's identity. *See* PPPA § 2.

67. Plaintiff and the members of the Class never consented to CBI disclosing their Private Reading Information to anyone.

68. Worse yet, Plaintiff and the members of the Class did not receive notice before CBI disclosed their Private Reading Information to third parties.

69. CBI's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

70. CBI's disclosures of Plaintiff's and the Class's Private Reading

Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their purchases.

71.    CBI's disclosures of Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase CBI's revenue. Accordingly, CBI's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

72.    By disclosing Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, CBI violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

73.    As a result of CBI's unlawful disclosure of their Private Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA). On behalf of himself and the Class, Plaintiff seeks: (1) $5,000.00 to Plaintiff and each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.   For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.   For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.   For prejudgment interest on all amounts awarded; and

F.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: August 31, 2022          Respectfully submitted,

**KYLE CLARKE**,

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*